IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

NICKY J. BARBER                                                    PLAINTIFF

                    v.                    Civil No. 11-3046

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                     DEFENDANT

<u>MEMORANDUM OPINION</u>

 Plaintiff, Nicky Barber, brings this action under 42 U.S.C. § 405(g), seeking judicial review of

a decision of the Commissioner of Social Security Administration (Commissioner) denying his claim for

a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI")

under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence

in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g)*.*

I. <u>Procedural Background</u>:

 The plaintiff filed his applications for DIB and SSI on May 24, 2004, alleging an onset date of

April 13, 2004, due to depression, post-traumatic stress disorder ("PTSD"), intermittent explosive

disorder, borderline intellectual functioning ("BIF"), arthritis, degenerative disc disease ("DDD"), burn

injuries to his hand and upper body, hypertension, gastroesophageal reflux disease ("GERD") and

vertigo.  Tr. 56-58, 99-100, 337-339.  His applications were initially denied and that denial was upheld

upon reconsideration.  Tr. 32-36, 39-42, 342-343.  An administrative hearing was held on October 6,

2006.  Tr. 348-388.  On March 3, 2007, the Administrative Law Judge ("ALJ") entered an unfavorable

decision.  Tr. 1-25.  On November 1, 2007, the Appeals Council denied review.  Tr. 4-7.  After Plaintiff

filed an appeal in district court, on October 30, 2008, the undersigned issued a Report and

Recommendation for remanding this case for further administrative proceedings for the ALJ to consider

Plaintiff's vertigo and resolve any inconsistencies in the vocational expert opinion.  Tr. 414-22.  On

November 21, 2008, the District Judge adopted the undersigned's  recommendation, and remanded the

case to the Agency for further administrative proceedings.  Tr. 413.  On December 2, 2008, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further administrative proceedings concerning the limitations resulting from Plaintiff's vertigo and Plaintiff's mental limitations.  Tr. 413-425.  The ALJ held a new hearing on July 13, 2009.  Tr. 497-518.  Plaintiff was present and represented by counsel.

At the time of the second administrative hearing, plaintiff was 46 years of age and possessed an eleventh grade education.  Tr. 131, 330-331.  He had past relevant work ("PRW") as a die-cast machine operator II and a poultry production operator.  Tr. 67-74.

On November 30, 2009, the Administrative Law Judge ("ALJ") concluded that Plaintiff's PTSD, intermittent explosive disorder, BIF, arthritis in the right shoulder, DDD in the lower lumbar spine, burn injuries to his hands, hypertension, and vertigo were severe impairments, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 402-405.  After partially discrediting Plaintiff's subjective complaints, the ALJ determined that Plaintiff retained the residual functional capacity to lift 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours, and stand and walk for 2 hours during an 8-hour workday.  Tr. 405-408.  He also concluded that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl;  frequently grasp and finger; and, must avoid hazards such as unprotected heights and moving machinery.  From a mental standpoint, the ALJ found Plaintiff had moderate restrictions in maintaining social functioning; concentration, persistence, and pace; understanding, remembering, and carrying out detailed instructions; responding appropriately to usual work situations and routine work changes; and, appropriately interacting with the public.  He concluded Plaintiff could only perform work where the interpersonal contact is incidental to the work performed; complexity of tasks is learned and performed by rote with few variables and little judgment; and supervision required is simple, direct and concrete.  With the assistance of a vocational

2

expert, the ALJ then concluded that Plaintiff could perform work as an assembler and machine tenderer. Tr. 409.

The ALJ's decision became the Commissioner's final decision when the Appeals Council did not assume jurisdiction. Tr. 389- 391. *See* 42 U.S.C. § 405(g). Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF No. 7, 8.

## II.   <u>Applicable Law</u>:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.*   As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or

AO72A
(Rev. 8/82)

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A.      The Evaluation Process:

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require his to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

4

III.   **Evidence Presented**:

On June 19, 1989, Plaintiff injured his back while lifting a transmission at work.  Tr. 119-129.  He complained of lower back pain that radiation down into both legs.  An examination revealed that his left calf was smaller than his right.  Tr. 119-129.

In June 1995, Plaintiff complained of neck radiating to right shoulder and headache.  Tr. 331-336.  An examination revealed pain with left lateral movement of neck.  X-rays revealed a reversed curvature of the cervical spine.  Tr. 335.  Plaintiff was diagnosed with cervical spasms and prescribed Cataflam and Flexeril.  Tr. 331-336.

In October 2003, Plaintiff was treated for vertigo, questionable muscle spasms in his stomach, and anxiety.  Tr. 222-228.  He was prescribed Vistaril.  Tr. 222-228.  Earlier treatment notes indicate that he had a history of dizziness, headaches, back pain, and lower left arm pain.  Tr. 119-129, 222-231, 277-279, 331-336.

In February 2004, Plaintiff was involved in a motor vehicle accident and treated for shoulder pain and a face contusion.  Tr. 207-210.  X-rays of his shoulder were negative.  Tr. 210.

In March 2004, Plaintiff complained of excessive sweating and headaches.  He was prescribed Norvasc to treat his hypertension and Darvocet for the headaches.  Tr. 211-215.  A CT scan of his head taken at this time was normal.  Tr. 211-215.

On April 13, 2004, Plaintiff followed-up concerning his chronic problems.  Tr. 242.  Again, the doctor diagnosed him with hypertension, vertigo, anxiety, and GERD.  Plaintiff also complained of tooth pain and blood in his emesis and stools, as well as increased problems with vertigo since coming off his blood pressure medications.  He indicated that he had some success with Meclizine in the past.  The doctor prescribed Norvasc, Meclizine, Paxil, and Protonix.  He then referred Plaintiff to a dentist.  Tr. 242.

On April 21, 2004, Plaintiff was treated in the Emergency Room ("ER") for GERD, chest pain, and vertigo. Tr. 216-221. Dr. Chapman was contacted and she advised Plaintiff to report to her office for samples of Protonix and to schedule an esophagogastroduodenoscopy ("EGD").        On April 29, 2004, Plaintiff underwent an EGD with a biopsy for H. Pylori, which revealed a normal duodenum, a normal esophagus, and gastritis of the total stomach. Tr. 201-209. Plaintiff was diagnosed with gastritis and reflux, and prescribed Aciphex. Tr. 201-206.

On May 11, 2004, Plaintiff was treated for right shoulder pain and anxiety. Tr. 241. He was all "hyped up," stating he had just quit his job and had thrown his girlfriend out of his house. He thought the Paxil was making his symptoms worse. However, his vertigo was "some better" and his reflux and chest pain were improved as he had begun watching what he ate. The doctor prescribed Norvasc, Paxil, Protonix, Meclazine, and Nexium. Tr. 241.

On May 16, 2004, Plaintiff was treated for sharp right shoulder pain that radiated down his arm. Tr. 196-199. There was no known recent trauma or repetitive use issues. Dr. Chapman had reportedly prescribed him Bextra a few days prior. X-rays of his shoulder were negative , and Plaintiff was advised to continue taking Bextra. The emergency room doctor also prescribed Vicodin and advised Plaintiff to consider a possible orthopaedic consultation for evaluation concerning steroid injections. Tr. 196-199.

On June 22, 2004, Plaintiff returned for a follow-up concerning his EGD. Tr. 240. His stomach had shown improvement, but he reported some swelling in his back. Plaintiff was diagnosed with GERD, vertigo, and hypertension. Tr. 240.

On July 27, 2004, Plaintiff sought treatment for heartburn related symptoms. Tr. 239. He reported belching, burping, and foaming at the mouth. His medications included Paxil, Vistaril, Accupril, Zyrtec, Antivert, Norvasc, Aciphex, and Ultracet. Tr. 239.

On August 6, 2004, Plaintiff sustained burns to 27% of his body when his home exploded due to a gas leak. Tr. 147-180, 186-194. He had 5% partial thickness burns to his head, 2% to his posterior

6

trunk, 4% to his right upper arm, 4% to his left upper arm, 3% to his right lower arm, 3% to his left lower arm, 2% to his right hand, and 2% to his left hand.  At the hospital, Plaintiff was intubated and maintained on a ventilator.  Some initial traumatic intubation was noted, but cleared quickly and no further problems were noted.  Plaintiff was weaned to a C-PAP machine on August 12, 2004, and was tube fed until August 13, 2004.  He was discharged from the hospital on August 16, 2004, with prescriptions for Oxycodone, Silvadene, Double Antibiotic, and Elta.

On August 16, 2004, Plaintiff had functional oral motor skills with all consistencies and mild pharyngeal dysphagia characterized by reduced laryngeal closure resulting in the aspiration of liquids. Tr. 144-146.  A swallow study revealed significantly increased risk of chronic, silent aspiration of liquids.  This risk was said to be lessened by thickening all liquids, avoiding thin liquids, sitting upright during meals, and taking small bites and single sips at a slow rate.  Therefore, Plaintiff was prescribed artificial thickeners.  Tr. 144-146.

On August 26, 2004, Plaintiff returned for a post discharge follow-up.  Tr. 141-143.  A puss pocket was drained and small areas remained opened on both hands and arms.  Otherwise, he was noted to be healing well.  Dr. Chapman advised him to continue applying the Silvadene to the open areas and the Elta cream until fully healed.  She also removed the suture hanging on the area where the chest tube had been placed, and told him to continue applying the Double Antibiotic cream to this area.  Tr. 142.

On September 3, 2004, Dr. Chapman noted flash and flame burns to his bilateral arms and hands, face, and chest.  Tr. 139-140.  She noted that 95% of his wounds had healed, but scattered open areas remained on the dorsal hands and lower arms.  The healed wounds remained dry.  Therefore, she prescribed Elta cream, Bactroban, and Oxycodone.  She also advised him to apply sun screen whenever in the sun.  Tr. 139.

On September 14, 2004, Plaintiff complained of belching, burping, and heartburn.  Tr. 299.  The doctor noted that he looked great, and his burns were healing well.  However, an examination revealed

7

pain with range of motion in his right shoulder.  The doctor ordered physical therapy for the right shoulder, and prescribed Paxil, Vistaril, Accupril, and Norvasc.  Tr. 299.

On September 16, 2004, Plaintiff's burns were healing and beginning to hypertrophy.  Tr. 137-138.  The small open areas were closing quickly.  Dr. Chapman advised him to continue the Bactroban until all of the wounds were closed and to continue the Elta cream.  Tr. 137.  Physical therapy also measured him for pressure garments to decrease the hypertrophic scarring.  Tr. 281.

On October 19, 2004, Plaintiff underwent a mental status exam and evaluation of adaptive functioning.  Tr. 130-134.  Dr. Stephen Harris, a psychologist, evaluated Plaintiff.  Plaintiff complained of physical problems related to a back injury he sustained in a car accident and leg problems.  Plaintiff also indicated that he had sustained substantial burns to his face, hands and upper body.  He stated that he did not like being around people and experienced anger problems in public.  Dr. Harris noted that Plaintiff was anxious with short, quick, clipped speech, slightly pressured speech, and a slight speech deficit.  He reported no hallucinations or delusions, but did state that noises and people saying things would often get him upset.  Plaintiff admitted feeling suspicious of others and having feelings of persecution.  He stated that he felt tired and experienced "the blues."  Plaintiff indicated that he wanted to cry a lot, feeling that "the world is coming down on me."  He stayed pretty much to himself and reported sleeping quite a bit of the time, although he did complain of some difficulty going to sleep. Plaintiff denied suicidal ideation, but admitted to some thoughts of violent behavior that did not rise to homicidal levels.  Dr. Harris estimated his IQ between 71 and 79, and indicated that his adaptive functioning and intellectual level appeared to be commensurate with borderline intellectual functioning ("BIF").  He then diagnosed him with PTSD, rule out intermittent explosive disorder, and BIF and assessed him with a global assessment of functioning score of 52.  Dr. Harris noted that Plaintiff took care of his own personal needs, such as bathing and clothing, although he did not dress daily.  He could drive and find his way on familiar routes, but reported difficulty on unfamiliar routes.  Plaintiff did most

of his own shopping along with a girlfriend, who reportedly performed most of the household chores. However, the girlfriend had left and Plaintiff was going to have to do his own shopping and chores. He told Dr. Harris that he did use a checkbook. Dr. Harris found him to be open and honest and capable of handling his own benefit payments. Tr. 134.

On October 28, 2004, Plaintiff's right hand had moderate hypertrophy. Tr. 135. Dr. Chapman fitted him for a Jobst pressure garment and told him to continue using the Elta cream. Tr. 135.

On December 14, 2004, Plaintiff requested a prescription for Paxil. Tr. 298. He stated that his heartburn had improved, but complained of back pain following a motorcycle accident. The doctor diagnosed him with lumbosacral back pain, GERD, and depression. He then prescribed Ultracet, Aciphex, and Zoloft. Tr. 298.

This same day, Plaintiff reported to the emergency room with complaints of body pain following a motorcycle accident the previous day. Tr. 182-185. He reported right shoulder and right wrist pain. It was noted that he also had a history of back pain. X-rays of his lumbosacral spine, shoulder and wrist were normal, but an examination did reveal tenderness at the right distal wrist and right shoulder blade. Plaintiff was diagnosed with back strain and contusions to the right wrist and shoulder. He was prescribed Vicodin and Robaxin. Tr. 182-185.

On December 21, 2004, Plaintiff underwent a general physical exam. Tr. 232-238. He complained of lower back pain, right elbow pain, shoulder pain, and chronic vertigo. Plaintiff also indicated that he was taking Zoloft to treat bipolar disorder. His medications were said to include Zoloft, Hydrocodone, Antivert, Vistaril, Accupril, Norvasc, and Bextra. An examination revealed a normal range of motion in all areas, but some pain in the right shoulder with palpation, pain in the lower back, and lumbosacral spine with range of motion, and left lower extremity weakness. His ability to grip, stand and walk without assistive devices, walk on heel and toes, and squat and arise for a squatting position were also limited. The doctor diagnosed him with lower back pain of unknown etiology; right shoulder

AO72A
(Rev. 8/82)

pain, possibly bursitis; right elbow pain, possibly osteoarthritis; 27% surface area burns with pain and scaring of the hands; hypertension; and, probable post-traumatic stress disorder secondary to the fire. The doctor determined that Plaintiff would have moderate limitations related to walking, sitting, and standing for prolonged periods of time and moderate-to-severe limitations with regard to stooping and lifting.  Further, he concluded that Plaintiff would have moderate limitations related to his hands and handling.  Tr. 232-238.

On April 26, 2005, Plaintiff complained of chest and back pain.  Tr. 297.  He was diagnosed with hypertension and lumbar sprain.  The doctor prescribed Accupril, Topamax, Celebrex, and an increased dosage of Ultracet.  Tr. 297.

On June 29, 2005, Plaintiff complained of pain in the neck, right shoulder, and thoracic spine, as well as a lack of energy.  Tr. 284-286.  He reported his neck pain as being moderate, and an examination revealed local paraspinous tenderness with muscle spasm, exacerbated by neck movements. Soft tissue tenderness with moderate muscle spasm was also noted in the posterior neck muscles. However, there was no evidence of local bony tenderness and the distal neurologic examination was completely normal.  And, he ambulated without difficulty.  Tr. 284-286.

On July 12, 2005, Plaintiff reported left shoulder pain.  Tr. 296.  An examination revealed tenderness in the left shoulder.  The doctor diagnosed him with bursitis of the right shoulder, depression/anxiety, hypertension, and an elevated fasting blood sugar. He prescribed Norvasc, Accupril, and diet changes.  The doctor also increased his dosages of Celebrex and Zoloft and referred him for physical therapy.  Tr. 296.

On February 28, 2006, Plaintiff complained of bilateral shoulder pain.  Tr. 295.  He was noted to have a history of right shoulder bursitis.  The doctor gave him a list of isometric exercises to perform and prescribed Celebrex.  Tr. 295.

10

On March 9, 2006, Plaintiff reported dizziness, but not true vertigo. Tr. 287-291. He was noted to be in moderate distress with a headache. Plaintiff also stated that he was sleeping a lot. An EKG and cardiac monitor were both normal, as were chest x-rays. Plaintiff was diagnosed with dizziness and a viral syndrome, and prescribed Meclizine. Tr. 287-291.

On March 14, 2006, Plaintiff complained of dizziness with changes in position. Tr. 294. The doctor diagnosed him with possible paroxysmal positional vertigo, GERD, hypertension, depression, and shoulder pain. Again, he was prescribed Ranitidine, Lisinopril, Celebrex, and Tramadol. The doctor also increased his Topamax dosage and prescribed home exercises for his vertigo. Tr. 294.

On May 23, 2006, Plaintiff complained of right sided neck pain that radiated into his ear. Tr. 293. He was diagnosed with hypertension, depression, and GERD. The doctor prescribed Norvasc, Lisonopril, Zoloft, Topamax, and Ranitidine. Tr. 293.

On July 14, 2006, Plaintiff presented at the emergency room with abdominal pain and complaints of vomiting and diarrhea. Tr. 307-316, 472-475. An examination revealed moderate abdominal tenderness with a full range of motion in all extremities, no muscle weakness, and a no psychiatric issues. Plaintiff was prescribed Bentyl. Tr. 307-316.

On August 23, 2006, Plaintiff had sustained a laceration to his right index finger when his finger became stuck between a jack and a trailer tongue. Tr. 318-321. As a result, the wound became infected and he had decreased sensation in this area. Plaintiff was prescribed Levaquin. Tr. 318-321. Two days later, he returned to the ER with complaints of hand pain, but left without being seen. Tr. 323-324. On August 26, 2006, Plaintiff returned. Tr. 326-327. He could flex and extend it well, although it was still somewhat swollen. The doctor prescribed Quinolone. Tr. 326-328.

On February 16, 2007, Medical Clinic Mission notes indicated that Plaintiff reported nerve jerking in his back. Tr. 467. The doctor also noted flight of ideas, pressured speech, and passive suicidal thoughts with no intent or plan. The doctor diagnosed Plaintiff with depression (suspect bipolar

11

disorder) and increased his Topamax dosage.  He also prescribed Vistaril and advised Plaintiff to follow

up with Ozark Guidance Center or Ozark Counseling Services.  Tr. 467.  There is, however, no evidence

that Plaintiff ever did so.

On June 12, 2007, Plaintiff complained of numbness in his left arm and fingers.  Tr. 466.  An

examination noted bilateral ulnar neuropathy with the left worse than the right and decreased sensation.

The doctor diagnosed him with GERD, osteoarthritis, ulnar neuropathy, and anxiety. He was prescribed

Ranitidine, Tramadol, Lisinopril, Norvasc, and Hydroxyzine, and referred for physical therapy and nerve

conduction studies.  Tr. 466.

On December 4, 2007, Plaintiff was diagnosed with hypertension and osteoarthritis.  Tr. 464.

He did not seek further treatment until  March 11, 2008, at which time he was noted to have tingling in

the fingers on both hands.  Tr. 463.  Then, on June 10, 2008, Plaintiff returned with no new complaints.

Tr. 462.  He received refills of Norvasc and Zoloft.  Tr. 462.

On November 4, 2008, records from the Medical Clinic Mission indicate that Plaintiff was

directed to continue his blood pressure medication, splint his elbows for straightening while sleeping,

continue the Zoloft, take Hydroxyzine, and continue Ranitidine to treat his GERD.  Tr. 460.

On March 10, 2009, Plaintiff's diagnoses included a recent upper respiratory infection,

hypertension, GERD, bursitis of the right shoulder, and vertigo.  He received refills of Norvasc and

Zoloft.  Tr. 492.

On June 27, 2009, Plaintiff's sister, Vicki Patrick submitted a statement to the ALJ.  Tr. 440-442.

She indicated that Plaintiff was hit by a car when his was 6 years old.  As an adult, Plaintiff reportedly

injured his back while working for a used auto parts business.  And, he now suffers from vertigo, which

involves sudden dizzy spells, stumbling, disorientation, and the need to lie down.  Ms. Patrick stated that

she had witnessed Plaintiff experience these spells and had even escorted him to the hospital to have his

12

symptoms treated.  She also reported first hand observation of his flashbacks and difficulty ambulating. Tr. 440-442.

**IV.**   **Discussion:**

Plaintiff contends that the ALJ erred by failing to clarify the record with regard to the definition of moderate limitations, failing to recontact Dr. Donahue to have him clarify his opinion; concluding Plaintiff can perform frequent handling and fingering; failing to adopt the conclusion of the non-examining consultative doctor who determined Plaintiff had decreased grip strength; improperly relying on his failure to attend physical therapy and undergo nerve conduction studies to discredit his complaints of neuropathy; failing to include his PTSD, intermittent explosive disorder, BIF, and arthritis of the right shoulder in the hypothetical question posed to the vocational expert ("VE"); and, inferring that Plaintiff lied to Dr. Harris about his drug use without ever questioning Plaintiff regarding this alleged discrepancy[1].  Given the plethora of Plaintiff's complaints, we will begin our analysis with a review of Plaintiff's subjective complaints and the ALJ's credibility analysis.

**A.**   **Subjective Complaints:**

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  *See id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints.  *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004).  However, the ALJ need not

---

[1]We will not, however, discuss this issue at length.  Even if the ALJ did fail to question Plaintiff regarding this issue, it is but one of many reasons the ALJ used to discredit Plaintiff's subjective complaints.

13

explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).

## 1.   **Physical  Limitations:**

Plaintiff has a history of intermittent conservative treatment for lower back, right shoulder, and neck pain. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). X-rays of the cervical spine obtained in June 1995 showed linear calcification at the C6-7 interspace that appeared degenerative. X-rays of his right shoulder performed in November 2002 revealed some prominent soft-tissue swelling. Additional x-rays conducted in December 2004 showed mild arthritic change in his acromioclavicular joint. Further, x-rays of his lumbar spine performed this same date revealed only DDD in the lower lumbar spine. A consultative exam conducted in December 2004 showed pain with right shoulder palpation, pain in Plaintiff's lower back and left lower extremity with range of motion, some muscle weakness in his left lower extremity, a lightly widened gait, and a diminished ability to stand and walk without assistive devices, walk on his heel and toes, and squat and arise from a sitting position. He opined Plaintiff would have moderate limitations in his ability to engage in prolonged walking/standing/sitting and using his hands/handling and moderate to severe limitations stooping and lifting. However, an ER examination in June 2005, showed that he ambulated without difficulty and

exhibited a completely normal distal neurologic exam.  An examination in July 2006 further showed a normal range of motion in all areas.  Tr. 307-316.  And, additional imaging studies/physical exams performed after the ALJ's initial decision in this case have established no deterioration in Plaintiff's condition.  Accordingly, while we do believe Plaintiff suffers from a level of pain that impacts his ability to perform work-related activities, we do not find the objective evidence supports his contention that this pain is totally disabling.  *See id.*; *Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

In addition to the pain related to degenerative and osteoarthritic conditions, Plaintiff also suffered 27% total body surface area burns to his arms, face, and neck in August 2004.  Following his discharge, Plaintiff was fitted with bilateral gloves to decrease the hypertrophic scarring.  In December 2004, a physical exam showed a decrease in his grip strength secondary to pain from his burns.  We note, however, that this examination occurred a mere four months after he incurred the burns and before his wounds had completely healed. An examination approximately three years later, on June 12, 2007, showed only some decreased sensation greater on the left than the right.  Tr. 406.  At this time, Plaintiff denied experiencing significant pain, stating that he only felt some aching.  *See id*.  He was referred for physical therapy and nerve conduction studies were ordered.  However, there is no evidence he ever underwent physical therapy or electrodiagnostic studies.  *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility.").  And, the evidence reveals that Plaintiff was able to ride his motorcycle, operate a jack, and change the transmission line in his truck without difficulty, after his burns had healed.  Tr. 21, 131, 318-321, 375-376.  We believe these activities required Plaintiff to have relatively good use of his hands for gripping and handling.

Further, records indicate that Plaintiff suffered from vertigo, for which he was prescribed Meclizine and Antivert.  This case had previously been remanded for the ALJ to properly consider

15

Plaintiff's vertigo. On remand, he determined that this impairment was severe and resulted in limitations preventing him from working near unprotected heights and moving machinery. We agree with the ALJ's assessment in this regard. While we do note that Plaintiff was repeatedly treated for vertigo, on at least one occasion he indicated that the Meclizine helped. *See Gowell*, 242 F.3d at 796. There is also a suggestion that Plaintiff's vertigo was impacted by his hypertension. Once his blood pressure was under control, it appears the severity and frequency of his complaints of vertigo related symptoms also diminished. And, Plaintiff remained able to drive a car and motorcycle, in spite of his episodic vertigo. As such, we do not believe that the objective evidence concerning his vertigo is of such severity as to render him totally disabled.

Plaintiff did assert some limitations regarding his elbows, but we can find no objective evidence of an impairment in elbows. The consultative physical exam in December 2004 showed a full range of motion in his elbows with no heat, swelling, or tenderness. Tr. 232-238. And, the July 2006 examination also showed a normal range of motion in all areas. Tr. 307-316.

We note that Plaintiff has also suffered from hypertension for which medication was prescribed. However, there is no evidence that the Plaintiff has associated significant end organ damage, a severe cardiac impairment, or congestive heart failure. Further, the evidence indicates that Plaintiff has not always taken his medication as prescribed. In March 2004, he was reportedly out of blood pressure medication and had been for two and a half months. Medication was prescribed, and Plaintiff returned in May with continued high blood pressure. Accupril was then added to his Norvasc. Subsequent records indicate that Plaintiff's blood pressure was fairly well controlled. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (an impairment that can be controlled via medication is not disabling).

Further, Plaintiff also had a history of GERD, for which he was prescribed various medications, including Protonix, Aciphex, Nexium, Reglan, and Ranitidine. His condition does appear to have been responsive to medication, and there is no evidence that it necessitated hospitalization or resulted in

malnutrition or weight loss.  *See id.*; *Forte*, 377 F.3d at 895.  And, we can ascertain no evidence to show that Plaintiff's GERD is of such severity as to warrant surgical intervention.  Accordingly, although a severe impairment, we can not find it to be disabling.

### 2.        Mental Limitations:

Additionally, Plaintiff had a history of outpatient medication management for mental symptoms/impairments.  Although Plaintiff contends that he attempted to get treatment at Ozark Guidance Center for approximately two years, we can find no evidence that he ever actually sought out professional mental health treatment or was ever hospitalized as a result of his mental impairments.  He was prescribed Paxil for anxiety in April 2004 and continued to take this until September 2004, at which time he was switched to Zoloft.  In October 2004, Plaintiff underwent a consultative exam with Dr. Harris who estimated Plaintiff's IQ to be between 71 and 79, and diagnosed him with PTSD, rule out intermittent explosive disorder, and BIF.  And, medical records received subsequent to the prior decision show continued treatment via medication, but no evidence of a deterioration of his condition or formal mental health treatment.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment).  Accordingly, although we do believe that Plaintiff's mental impairments were severe, substantial evidence supports the ALJ's determination that his impairments were not as severe as alleged.

### 3.        Financial Hardship:

Plaintiff contends that he failed to participate in physical therapy, undergo nerve conduction studies, and seek out more consistent medical treatment and formal mental health treatment due to financial hardship.  We are well aware that a lack of funds may justify a person's failure to obtain medical care or to follow medical advice.  *Osborne v. Barnhart,* 316 F.3d 809, 812 (8th Cir. 2003).  However, a lack of funds alone will not suffice. The Secretary's regulations provide that a claimant who

AO72A
(Rev. 8/82)

fails to treat a remediable condition without good reason is barred from entitlement to benefits.  20 C.F.R. § 404.1518 (1980); 20 C.F.R. § 404.1530 (1983).  Generally speaking, a lack of evidence that the claimant attempted to find any low cost or no cost medical treatment for her alleged pain and disability is inconsistent with a claim of disabling pain.  *Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992).  Here, Plaintiff has not shown that he exhausted all of the possible alternatives to receiving treatment at a reduced rate or free of charge. *See Osborne*, 316 F.3d at 812; *Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992)(noting that financial hardship must be taken into account, but there was no evidence that the claimant sought low-cost medical treatment from her doctor, or from clinics or hospitals). Therefore, Plaintiff's argument is without merit.

### 4.    Testimony of Family and Friends:

Plaintiff's sister submitted a statement on Plaintiff's behalf, and his girlfriend testified at the administrative hearing on remand.  We note, however, that their testimony was primarily cumulative of Plaintiff's testimony.  Tr. 326-329.  Further, the ALJ noted that Plaintiff's girlfriend would benefit financially from any monies Plaintiff's received.  See *Owenbey v. Shalala*, 5 F.3d 342 (8th Cir. 1993) (stating testimony of individual who would benefit financially from Plaintiff's award of benefits may be discounted).  As it is clear that the ALJ properly considered this testimony but found it unpersuasive, we find that the ALJ's decision to discount their testimony was well within his province.  *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

### 5.    Activities of Daily Living:

Plaintiff's own reports concerning his daily activities also undermine his claim of disability. In May 2004, Plaintiff completed a Supplemental Disability Interview Outline. Tr. 84-85.  He stated that he could care for his personal hygiene, change the sheets, vacuum/sweep, take out the trash, wash the car, prepare simple meals, drive, and listen to the radio.  Further, in August 2006, Plaintiff was treated after his finger was trapped between a jack and a trailer tongue, and he testified that he was late to the

administrative hearing because he was changing a transmission line on his truck.  Tr. 21, 318-21, 375-376.  Evidence also indicates that Plaintiff was able to ride a motorcycle.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Clearly, these are not the daily activities one would expect a disabled person to be able to perform.

   **B.      The ALJ's RFC Assessment:**

   We next examine the ALJ's RFC assessment.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or his RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  *Lauer v. Apfel,*  245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered Plaintiff's subjective complaints, the objective medical evidence, the consultative exams, and the RFC assessments of the non-examining, consultative doctors.  On January 3, 2005, Dr. Robert Redd completed a physical RFC assessment. Tr. 264-275.  After reviewing Plaintiff's medical records, he found that Plaintiff could lift 10 pounds frequently and 20 pounds occasionally.  Dr. Redd also concluded that Plaintiff could sit, stand, and walk for 6 hours during an 8-hour workday.  Tr. 246-275.  This was affirmed by Dr. Steve Owens on March 26, 2005.  Tr. 275.

On November 4, 2004, Dr. Dan Donahue completed a mental RFC assessment and a psychiatric review technique form.  Tr. 243-263.  After reviewing Plaintiff's medical records, he determined that Plaintiff had moderate limitations with regard to understanding, remembering, and carrying out detailed instructions; maintaining attention; completing a normal workday; interacting with the public; setting realistic goals; and, making plans independently of others.  Dr. Donahue also concluded that Plaintiff could perform work where the interpersonal contact is incidental to the work performed, the complexity of the tasks is learned and performed by rote, with few variables, little judgment, and simple, direct, and concrete supervision.  He found moderate limitations with regard to Plaintiff's ability to maintain social functioning and attention, concentration, and pace, but no evidence of decompensation.  Tr. 243-263.

The ALJ concluded that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours, and stand and walk for 2 hours during an 8-hour work;  occasionally climb, balance, stoop, kneel, crouch, and crawl;  frequently grasp and finger;  must avoid hazards such as unprotected heights and moving machinery;  would have moderate restrictions in maintaining social functioning, concentration, persistence, and pace, understanding, remembering, and carrying out detailed instructions, responding appropriately to usual work situations and routine work changes, and appropriately interacting with the public; and, could only perform work where the interpersonal contact is incidental to the work performed, the  complexity of tasks is learned and performed by rote with few variables and little judgment, and the supervision required is simple, direct, and concrete.  Plaintiff

20

contends that this RFC assessment is flawed because it does not take into account the limitations imposed by the burn injuries to his hands. However, as previously noted, the December 2004 examination showed decreased grip strength and difficulties with handling occurred a mere four months after his burn injuries and prior to total healing. Subsequent exams have shown some decreased sensation, but have revealed no lingering range of motion or grip strength limitations. And, Plaintiff remains capable of riding his motorcycle, operating a jack, and changing transmission lines on his vehicle. Therefore, we believe the evidence establishes that Plaintiff could frequently grasp and finger.

Plaintiff also asserts that the ALJ's assessment is flawed, as he failed to clarify the record concerning the definition of moderate limitations in various areas of mental functioning. We previously remanded this matter for clarification of the definition of the term moderate as it relates to Plaintiff's mental limitations. At the first hearing, the vocational expert testified that an individual with moderate limitations with regard to concentration would not be able to maintain employment, as he would experience difficulty at least 1/3 of the time. On remand, the ALJ defined the term moderate to mean more than a slight limitations but retaining the ability to perform in a satisfactory manner. Plaintiff contends that the RFC assessment completed by Dr. Donahue and relied upon by the ALJ in concluding that Plaintiff would have moderate mental limitations does not include a definition of that term, rendering him unable to definitively say that the ALJ and Dr. Donahue were on the same page. We note, however, that the term moderate is not defined in the Social Security regulations. *See Hamby v. Astrue*, No. 3:07CV00112HDY, 2008 WL 2387603, *5 (E.D. AR June 9, 2008). However, the term is commonly defined on paperwork prepared by the agency as meaning that the individual is still able to function satisfactorily. *Lacroix v. Barnhart*, 465 F.3d 881, 888 (8th Cir. 2006). And, Dr. Donahue is frequently asked to complete non-examining consultative assessment for the agency. Thus, we feel that the ALJ's definition was in alignment with the definition of the term as it is widely used in the social

21

security litigation arena.  We also feel that the objective evidence supports a finding of no more than moderate limitations, as the term moderate is generally defined.  Therefore, we find no error.

Plaintiff also contends he is unable to be around loud noises due to his PTSD and experiences limitations involving his right shoulder.  While we do note that Plaintiff has been diagnosed with PTSD, sustained significant burns in a house fire in 2004, and had been treated for bursitis in his right shoulder, the evidence simply does not support the level of impairment Plaintiff now alleges.  His most recent physical exam revealed a full range of motion in all areas, and x-rays have revealed minimal abnormalities.  Tr. 307-316.  Plaintiff has also failed to seek out formal mental health treatment for his alleged mental impairments.  And, there is no indication that his PTSD and flashback resulted in any episodes of decompensation or necessitated hospitalization.  Had these impairments been as severe as alleged, we believe Plaintiff would have sought out more consistent treatment and that the objective evidence would have established significant symptoms and limitations associated with these impairments.  However, this is not borne out by the overall record.  Accordingly, we find that the ALJ's RFC determination is supported by substantial evidence.

C.    **Vocational Expert's Testimony:**

Testimony from a vocational expert ("VE") based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The VE testified that a person of Plaintiff's age, education, and work background with the above RFC, could still perform work as an assembler and machine tenderer.  Tr. 455-458. When questioned

AO72A
(Rev. 8/82)

by Plaintiff's counsel, the expert also indicated that an inability to be around loud noises or to only occasionally finger and handle would eliminate all available jobs.

Plaintiff contends that the hypothetical question posed to the expert was flawed because it did not include all of the symptoms associated with his PTSD, intermittent explosive disorder, BIF, and arthritis of the right shoulder.   We disagree.   A hypothetical need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments.  *Roe v. Chater*, 92 f.3d 672, 676 (8th Cir. 1996).   In reviewing the evidence of record, we believe that the ALJ's hypothetical captured the concrete consequences of Plaintiff's mental limitations even though the specific diagnoses were not mentioned.   The ALJ specifically listed out the areas in which Plaintiff would have moderate limitations.   And, we find that these are the only limitations borne out by the record.   Further, the United States Court of Appeals for the Eighth Circuit has held that  describing a claimant as capable of doing only simple work adequately accounts for a diagnosis of BIF.  *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001).     Accordingly, since the ALJ is only required to include in the hypothetical the limitations he finds are substantially supported by the record as a whole, in this case, the hypothetical question was properly phrased and the ALJ was entitled to rely on the expert's testimony.

**V.**   **Conclusion**:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 6th day of August 2012.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE